# Supreme Court of Florida

————

No. SC2023-0988

————

**CITIZENS OF THE STATE OF FLORIDA, etc.,**
Appellant,

vs.

**FLORIDA PUBLIC SERVICE COMMISSION,**
Appellee.

June 4, 2026

FRANCIS, J.

The Office of Public Counsel (OPC) appeals the Public Service Commission's (the Commission's) partial approval of Florida City Gas's (FCG's)[1] petition for a rate increase.[2] Specifically, OPC challenges the Commission's approval of two accounting measures that impact FCG's rate plan: (1) the Reserve Surplus Amortization

---

1. FCG is a utility company and subsidiary of Florida Power & Light Company (FPL), serving residential, commercial, and industrial customers in Miami-Dade, Broward, St. Lucie, Indian River, Brevard, Palm Beach, Hendry, and Martin counties. It sells and transports natural gas to customers.

2. We have jurisdiction. *See* art. V, § 3(b)(2), Fla. Const.

Mechanism-Adjusted Depreciation Parameters (RSAM-ADP); and (2) the Reserve Surplus Amortization Mechanism (RSAM). OPC also challenges the Commission's continuation of an accounting adjustment related to a corporate transaction, referred to as an acquisition adjustment. We affirm.

## I. BACKGROUND

In 2022, FCG petitioned the Commission, seeking approval of a four-year rate plan. In relevant part, FCG's petition sought approval of the above-mentioned RSAM-ADP and the RSAM. The continuation of an acquisition adjustment was not initially addressed in FCG's petition, but it became an issue during litigation.

With respect to the RSAM-ADP, at the final hearing the Commission considered three different depreciation proposals: (1) FCG's 2022 Depreciation Study, a mandatory depreciation study; (2) the RSAM-ADP, FCG's alternative depreciation study; and (3) OPC's proposed Depreciation Parameters. While each of these proposals was based on slightly different underlying depreciation parameters, according to FCG's lead witness Ned Allis, each of FCG's proposals was within the "range of reasonableness."

The RSAM-ADP—according to the collective testimonies of Mr. Allis and Mark Campbell—was a reasonable alternative to the traditional depreciation parameters and, if adopted, would provide customers with rate stability and certainty and avoid repetitive and costly rate proceedings. Liz Fuentes also testified that the RSAM-ADP was based on depreciation parameters that were previously approved by the Commission. Their individual testimonies are further discussed below.

FCG, however, offered no testimony regarding whether the RSAM-ADP complied with the Commission's Depreciation Rule.[3]

Under the Depreciation Rule, when there is a reserve deficiency or surplus[4] because of proposed depreciation parameters, two things must happen. First, a gas utility's depreciation study must explain and justify "any proposed transfers

_____

3. *See* Fla. Admin. Code R. 25-7.045 (regulating gas utilities' obligation to account for depreciation in the ratemaking process).

4. We have explained that "[a] depreciation reserve surplus occurs when a company collects a higher amount than needed to cover depreciation expenses given new information revealing that an asset, like a plant, has a longer-than-expected service life." *Floridians Against Increased Rates, Inc. v. Clark* (*FAIR*), 371 So. 3d 905, 908 n.8 (Fla. 2023).

of reserve between categories or accounts intended to correct deficient or surplus reserve balances." Fla. Admin. Code R. 25-7.045(5)(f). And second, the Commission should investigate "[t]he possibility of [a] corrective reserve transfer[] . . . prior to changing depreciation rates." *Id.* R. 25-7.045(4)(e).

In its final order, the Commission ultimately determined that "the appropriate depreciation parameters in this case are the RSAM-[ADP] proposed by FCG."

The Commission recognized, however, that approval of the RSAM-ADP would lead to a $52.1 million *reserve surplus.* Because of this, the Commission next evaluated FCG's proposed corrective measure—the RSAM.[5]

Regarding the RSAM, the Commission received extensive testimony from Mr. Campbell, who explained that "[t]he RSAM is an

---

5. The RSAM is an accounting mechanism that allows FCG to respond to changes in its underlying revenues and expenses during the four-year rate plan to maintain a return on equity (ROE) within the range authorized by the Commission. It results in non-cash earnings only and allows FCG to absorb changes in cash revenues and expenses while maintaining a pre-established ROE within its authorized range and without seeking additional increases in customer rates.

accounting mechanism that will be used by [FCG] to respond to changes in its underlying revenues and expenses" and that the RSAM would allow FCG "to manage typical day-to-day fluctuations associated with running a utility business, while also having to absorb higher costs . . . as a result of record inflation and rising interest rates."

The Commission ultimately approved "FCG's proposed use of the RSAM," which would use $25 million of the total reserve surplus created by the RSAM-ADP.

Finally, the Commission addressed FCG's request for the continuation of the acquisition adjustment.[6] The acquisition

---

6. The Commission has defined an acquisition adjustment as a "regulatory convention by which the books of the utility are adjusted to reflect changes in the original cost rate base valuation resulting from purchase prices that differ from original cost rate base valuations." *In re Proposed Rule 25-30.0371, F.A.C., Acquisition Adjustment*, Order No. PSC-02-0997-FOF-WS at 1, 2002 WL 1769379 (Fla. P.S.C. July 23, 2002); *see also In re Petition for Approval of Acquisition Adjustment & Recognition of Regul. Asset to Reflect Purchase of Fla. City Gas by AGL Res., Inc.*, Order No. PSC-07-0913-PAA-GU at 2, 2007 WL 4164224 (Fla. P.S.C. Nov. 13, 2007) (*2007 AGLR Order*) ("An acquisition adjustment is the difference between the purchase price of a utility and an original cost calculation."). The Commission has explained that "[s]uch an adjustment provides an incentive for stronger companies to

adjustment at issue here originates from when AGL Resources, Inc. (AGLR) acquired FCG in 2004, which the Commission approved in 2007 via a final order.[7]  After the Commission approved the acquisition adjustment in 2007, FCG changed ownership twice: first, in 2016 when Southern Gas Company (Southern) acquired AGLR; and second, in 2018 when NextEra Energy, Inc. (FPL's parent company) acquired Southern.  Importantly, despite changing hands twice since the acquisition adjustment was originally approved, FCG has continued to amortize the 2007 AGLR acquisition adjustment.[8]

As for FCG's rate petition here, it did not request approval of an acquisition adjustment.  When this issue came to light, FCG presented the rebuttal testimony of Ms. Fuentes in support of the

---

purchase weak or troubled companies." *2007 AGLR Order*, No. PSC-07-0913-PAA-GU at 2, 2007 WL 4164224.

7.  *2007 AGLR Order*, No. PSC-07-0913-PAA-GU at 9, 2007 WL 4164224.

8.  In 2018, the Commission and FCG resolved FCG's most recent rates case via a settlement agreement.  *See generally In re Petition for Rate Increase by Fla. City Gas*, Order No. PSC-18-0190-FOF-GU, 2018 WL 1942172 (Fla. P.S.C. Apr. 20, 2018) (*2018 FCG Order*).

continuation of the acquisition adjustment and related amortization. Her testimony is discussed further below.

The Commission determined that "the amortization of the acquisition adjustment shall continue" until FCG's next rate case.

In response to the Commission's final order approving the RDSAM-ADP, RSAM, and acquisition adjudgment, OPC filed a motion for reconsideration challenging only the approvals of the RSAM-ADP and the RSAM. While that motion was pending, OPC also timely appealed the Commission's final order to this Court. The Commission denied the motion for reconsideration but not before issuing a clarifying order, which OPC also timely appealed. These consolidated appeals follow.

## II. STANDARD OF REVIEW

"The Commission's decisions arrive here 'with the presumption that they are reasonable and just.'" *Floridians Against Increased Rates, Inc. v. Clark* (*FAIR*), 371 So. 3d 905, 911 (Fla. 2023) (quoting *W. Fla. Elec. Coop. Ass'n, Inc. v. Jacobs*, 887 So. 2d 1200, 1204 (Fla. 2004)). "Similarly, the Commission's factual findings are entitled to a presumption of correctness." *S. All. for Clean Energy v. Graham*, 113 So. 3d 742, 752 (Fla. 2013) (quoting *Crist v. Jaber*, 908 So. 2d

- 7 -

426, 430 (Fla. 2005)). This Court's role is to ensure that, "first, the Commission's factual findings are supported by competent, substantial evidence and, second, that the Commission's policy decisions are 'within the range of discretion given to the Commission by the Legislature.'" *Fla. Rising, Inc. v. Fla. Pub. Serv. Comm'n*, 415 So. 3d 135, 140 (Fla. 2025) (quoting *FAIR*, 371 So. 3d at 910-11). We accomplish that second objective by "evaluating whether the Commission articulated a reasoned explanation for its decision, one that includes a rational connection between the facts found and the choice made." *Id.* (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). If the Commission did so, "we cannot substitute our judgment for that of the Commission." *Id.*[9]

---

9. In *FAIR*, we explained that when the Commission issues an order, it must "give us something to work with: a decision that is reasoned and articulated enough to allow us to assess on what basis it has concluded that the [decision] is in the public interest and results in rates that are fair, just, and reasonable." 371 So. 3d at 911 (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947)). While the final order and the clarifying final order in this case were issued before *FAIR*, we nonetheless find that decision instructive here, summarizing as it does what we have long held to be the law in these cases. *See, e.g., Citizens of State v. Graham*, 213 So. 3d 703, 711 (Fla. 2017) ("Judicial review proceedings under Section 120.68 . . . press for [crystallization] of

### III. ANALYSIS

### A. The Commission's Approval of the RSAM-ADP Is Not Inconsistent with the Depreciation Rule

OPC's first claim is that we should reverse the decision below because the Commission's approval of the RSAM-ADP created a reserve imbalance surplus, which is inconsistent with the Depreciation Rule. *See* § 120.68(7)(e)2., Fla. Stat. (requiring this Court to "remand a case to the agency for further proceedings consistent with the court's decision or set aside agency action . . . when it finds that . . . [t]he agency's exercise of discretion was . . . [i]nconsistent with agency rule").

We find no inconsistency in the Commission's actions because nothing in the Depreciation Rule prohibits the Commission from approving depreciation parameters that result in a reserve imbalance surplus.

At issue are the two Depreciation Rule requirements—which we already noted—for when depreciation parameters result in a reserve imbalance: (1) the Commission must investigate "[t]he

---

agency discretion." (quoting *McDonald v. Dep't of Banking & Fin.*, 346 So. 2d 569, 583 (Fla. 1st DCA 1977))).

possibility of [a] corrective reserve transfer . . . prior to changing depreciation rates"; and (2) a utility must explain and justify "any proposed transfers of reserve between categories or accounts intended to correct deficient or surplus reserve balances." Fla. Admin. Code R. 25-7.045(4)(e), (5)(f).

While these requirements clearly contemplate the correction of a reserve imbalance, the text of the Depreciation Rule does not prescribe any one way to achieve a correction. At bottom, it only requires that the petitioning company *explain* and *justify* a correction, and that the Commission *investigate the possibility* of a correction. *See id.* R. 25-7.045(4)(e), (5)(f); *In re Petition for Approval of 2019 Consol. Depreciation Study by Fla. Pub. Utils. Co., Fla. Pub. Utils. Co.-Indiantown Div., Fla. Pub. Utils. Co.-Fort Meade, & Fla. Div. of Chesapeake Utils. Corp.*, Order No. PSC-19-0433-PAA-GU at 4, 2019 WL 5497889, at *4 (Fla. P.S.C. Oct. 22, 2019) (*2019 FPUC Petition*) (explaining that although the Commission has "approved reserve transfers to reduce or eliminate reserve imbalances in the past," "Rule 25-7.045(4)(e), F.A.C., does not require that reserve transfers be performed, *only that reserve imbalances be identified*" (emphasis added)). So as a textual matter, the Depreciation Rule

- 10 -

does not prohibit the Commission from adopting depreciation parameters that result in a reserve imbalance surplus. *See* Fla. Admin. Code R. 25-7.045.

On the contrary, it specifically contemplates the possibility that updated depreciation parameters *will* result in a reserve imbalance surplus because it defines "Reserve Surplus" and provides for corrective transfers to correct any resulting reserve imbalances. *See id.* R. 25-7.045(1)(i), (4)(e), (5)(f). Consistent with this interpretation, the Commission has previously approved depreciation parameters that have resulted in reserve imbalances when applying the Depreciation Rule. *See, e.g.*, *In re Petition for Increase in Rates by Fla. Power & Light Co.*, Order No. PSC-10-0153-FOF-EI at 81, 2010 WL 1005321 (Fla. P.S.C. Mar. 17, 2010) (*2010 FPL Case*) (approving updated depreciation estimates that resulted in "a reserve surplus of $1,208.8 million").[10]

---

10. *See also In re Application for Approval of New Depreciation Rates by Tampa Elec. Co. d/b/a Peoples Gas Sys.*, Order No. PSC-02-1492-PAA-GU at 2-3, 2002 WL 31465320 (Fla. P.S.C. Oct. 31, 2002); *In re 1997 Depreciation Study by Fla. Pub. Utils. Co., Marianna Div.*, Order No. PSC-97-1609-FOF-EI at 2-3, 1997 WL 796537, at *2-3 (Fla. P.S.C. Dec. 22, 1997); *In re S. Gas Co., a Div.*

Here, the record establishes that FCG and the Commission complied with their obligations under the Depreciation Rule. FCG filed a depreciation study that included the RSAM-ADP as a reasonable alternative to its 2022 Depreciation Study. In recognizing that the adoption of the RSAM-ADP would result in a reserve imbalance surplus, FCG proposed to correct the surplus by adopting the RSAM. And by doing so, FCG fully complied with the Depreciation Rule requirement that a depreciation study "discuss any proposed transfers of reserve between categories or accounts intended to correct deficient or surplus reserve balances." Fla. Admin. Code R. 25-7.045(5)(f).

After considering evidence and arguments from the parties regarding the proposed sets of depreciation parameters, the Commission concluded that the "appropriate depreciation parameters in this case are the RSAM-adjusted parameters proposed by FCG." And, because the Commission recognized that these parameters resulted in a reserve imbalance surplus, the

*of Iowa Pub. Serv. Co. – 1987 Depreciation Study*, Order No. 20560, 1989 WL 1639686 (Fla. P.S.C. Jan. 6, 1989).

Commission approved the RSAM to correct the imbalance. Consequently, the Commission also complied with the Depreciation Rule's requirement that it investigate "[t]he possibility of [a] corrective reserve transfer[] . . . prior to changing depreciation rates." *Id.* R. 25-7.045(4)(e). Having articulated these considerations, the Commission's approval of the RSAM-ADP is adequately justified and is not inconsistent with the Depreciation Rule.

**B.  The Commission's Approvals of the RSAM-ADP and the RSAM Are Not Inconsistent with Official Policy or Prior Practice and Are Supported by Competent, Substantial Evidence**

OPC next argues that the Commission's approvals of the RSAM-ADP and the RSAM are not supported by competent, substantial evidence and are inconsistent with both the Commission's official policy requiring it to follow the "matching principle" and prior practice of only approving an RSAM within a settlement agreement. Finding no merit to these claims, we reject each of them.

### *OPC's Official Policy or Practice Arguments*

First, OPC asserts that the Commission's approvals of the

- 13 -

RSAM-ADP and the RSAM are inconsistent with the Commission's official policy or practice. As evidence of the Commission's officially stated policy,[11] OPC points to language in a 2010 order, in which the Commission stated, "[w]hether the reserve imbalance is a surplus or a deficit, it violates the matching principle . . . and thus should be corrected." *2010 FPL Case*, Order No. PSC-10-0153-FOF-EI at 86-87, 2010 WL 1005321.

We disagree. This language can hardly qualify as "officially stated agency policy" when the very same agency has taken this and a variety of other approaches to resolving the singular issue of correcting imbalances. For example, in just the past decade, the Commission has approved: corrective transfers;[12] the "remaining

---

11. This Court "shall remand a case to the agency for further proceedings consistent with the court's decision or set aside agency action . . . when it finds that . . . [t]he agency's exercise of discretion was . . . [i]nconsistent with officially stated agency policy." § 120.68(7)(e)3., Fla. Stat.

12. *See, e.g.*, *2019 FPUC Petition*, Order No. PSC-19-0433-PAA-GU at 4, 2019 WL 5497889, at *4 (ordering corrective transfers between depreciation accounts to reduce the "most significant reserve imbalances"); *2010 FPL Case*, Order No. PSC-10-0153-FOF-EI at 84, 86, 2010 WL 1005321 (transferring $314.2 million of a $1.2 billion reserve surplus "to offset the expenses associated with its proposed capital recovery schedules").

- 14 -

life technique;"[13] an "accelerated method;"[14] and more recently, the RSAM.[15] Moreover, in a subsequent Commission order, the Commission explained that "[w]hen a reserve imbalance exists . . . reserve transfers *may* be performed." *2019 FPUC Petition*, Order No. PSC-2019-0433-PAA-GU at 4, 2019 WL 5497889, at *4 (emphasis added). The permissive "may" was further elucidated in the same order when the Commission explicitly explained that the

---

13. *See, e.g.*, *2019 FPUC Petition*, Order No. PSC-19-0433-PAA-GU at 4, 2019 WL 5497889, at *4 (explaining that "[a]s a functional matter, the remaining life depreciation rate . . . corrects any reserve imbalance over the life of the account, thus 'self-correcting' any imbalance"; ordering that a reserve imbalance should remain on the company's books; and finding that "[t]here will likely be better information for determining the necessity of reserve transfers in the future"); *2010 FPL Case*, Order No. PSC-0153-FOF-EI at 84, 2010 WL 1005321 (explaining that "[t]he remaining life rate typically carries the burden of correcting any reserve imbalance").

14. *See, e.g.*, *2010 FPL Case*, Order No. PSC-10-0153-FOF-EI at 87, 2010 WL 1005321 (ordering $894.6 million of a $1.2 billion surplus to be amortized over four years).

15. *See, e.g.*, *In re Petition for Rate Increase by Fla. Power & Light Co.*, Order No. PSC-2021-0446-S-EI at 11 n.29, 2021 WL 5865564 (Fla. P.S.C. Dec. 2, 2021) ("2019 FPL Case"), *as amended by* Order No. PSC-2021-0446-S-EI, 2021 WL 5884309 (Fla. P.S.C. Dec. 9, 2021) (stating that "[t]he RSAM concept was first approved as part of a Settlement Agreement for FPL in 2011), *remanded on other grounds sub nom. FAIR*, 371 So. 3d 905.

Depreciation Rule "does not require that reserve transfers be performed, *only that reserve imbalances be identified*." *Id.* (emphasis added).

What all this shows is simply this: when a reserve imbalance is identified, the Commission has some measure of discretion in deciding whether and how to correct it, and we review whether its decision falls within its delegated range of discretion. *See FAIR*, 371 So. 3d at 910-11.

Here, the Commission first recognized that its approval of the RSAM-ADP would result in a reserve imbalance, and then considered "what corrective measures should be taken with regard to that reserve imbalance." The Commission observed that OPC argued for using the remaining life technique while FCG advocated for the RSAM. The Commission heard testimony that both approaches were reasonable to measure depreciation. After considering OPC testimony that using the RSAM might shift risk to customers, the Commission was ultimately "persuaded by the testimony that the RSAM would allow FCG to manage its day-to-day fluctuations as well as take on the risk of both actual current as well as potential future increases in interest rates and inflation."

Accordingly, the Commission approved the RSAM, finding that it would provide customers with rate stability and certainty.

In other words, the Commission provided a reasoned basis for judicial review in making its determination. *See id.* at 911. And that basis was within the Commission's delegated discretion, as choosing the RSAM was rationally connected to its finding that the RSAM would provide customers rate stability and certainty. *See Fla. Rising, Inc.*, 415 So. 3d at 140 (stating that the Commission acts within its scope of authority when "the Commission articulate[s] a reasoned explanation for its decision, one that includes a rational connection between the facts found and the choice made"). Its decision was not a departure from officially stated policy, but a selection from within a range of permissible policy choices. And this "[C]ourt shall not substitute its judgment for that of the agency on an issue of discretion." § 120.68(7)(e), Fla. Stat.

### OPC's Settlement Agreement Argument

Next, while it is true that the Commission has on prior occasions approved requests for RSAM-ADP and RSAM when they have been advanced in the context of a settlement agreement, we

- 17 -

cannot say that doing so here contravenes prior Commission practice in the sense that calls for a remand under applicable law. This Court must remand a case for further agency proceedings if we find that the "agency's exercise of discretion was . . . [i]nconsistent with officially stated agency policy or a prior agency practice, if deviation therefrom is not explained by the agency." § 120.68(7)(e)3., Fla. Stat. Put another way, "agency action which yields inconsistent results based upon similar facts, without reasonable explanation, is improper." *Fla. Cities Water Co. v. State*, 705 So. 2d 620, 626 (Fla. 1st DCA 1998) (quoting *Martin Mem'l Hosp. Ass'n v. Dep't of HRS*, 584 So. 2d 39, 40 (Fla. 4th DCA 1991)). To prove its "prior practice" claim, OPC cites prior orders[16] where the Commission approved RSAM-ADP and an RSAM within a

---

16. *In re Petition for Rate Increase by Peoples Gas Sys.*, Order No. PSC-20-0485-FOF-GU at 25, 2020 WL 7344673, at *15 (Fla. P.S.C. Dec. 10, 2020) (*2020 PGS Order*); *2019 FPL Case*, Order No. PSC-2021-0446-S-EI at 55, 2021 WL 5865564; *In re Petition for Rate Increase by Fla. Power & Light Co.*, Order No. PSC-2016-0560-AS-EI at 2, 30, 2016 WL 7335779, at *2 (Fla. P.S.C. Dec. 15, 2016); *In re Petition for Increase in Rates by Fla. Power & Light Co.*, Order No. PSC-13-0023-S-EI at 26, 2013 WL 209584, at *17 (Fla. P.S.C. Jan. 14, 2013); *In re 2009 Depreciation & Dismantlement Study by Fla. Power & Light Co.*, Order No. 11-0089-S-EI at 22 (Fla. P.S.C. Feb. 1, 2011).

settlement agreement.

These precedents do not stand for the proposition that the Commission cannot exercise individualized judgment in each case. Indeed, OPC did not identify, and the Court did not find, a single prior case where the Commission refused to approve RSAM-ADP or an RSAM in a fully litigated case.

Moreover, the Commission reasonably explained its action, as it acknowledged that it has both the jurisdictional and statutory authority to do what it did here. "The [Commission] derives its authority solely from the legislature, which defines the [Commission's] jurisdiction, duties, and powers." *Fla. Pub. Serv. Comm'n v. Bryson*, 569 So. 2d 1253, 1254 (Fla. 1990) (citing *United Tel. Co. v. Pub. Serv. Comm'n*, 496 So. 2d 116, 118 (Fla. 1986)). "The legislature granted the Commission exclusive jurisdiction over matters respecting the rates and service of public utilities." *Citizens of State v. Fla. Pub. Serv. Comm'n* (*Citizens I*), 146 So. 3d 1143, 1150 (Fla. 2014) (citation modified) (quoting *Bryson*, 569 So. 2d at 1254). "Further, section 366.04, Florida Statutes, provides the Commission with jurisdiction to regulate and supervise each public utility with respect to its rates and service . . . ." *Id.* ("In the

exercise of such jurisdiction, the commission shall have power to prescribe fair and reasonable rates and charges . . . ." (quoting § 366.05(1), Fla. Stat.)).

As the Commission correctly recognized in the final order, chapter 366 does not condition the Commission's jurisdiction and authority to fix fair and reasonable rates on whether the case is litigated or settled. *See* § 366.05, Fla. Stat.; *see also FAIR*, 371 So. 3d at 907 n.2 (rejecting the argument that the Commission lacks the statutory authority to approve an RSAM through a settlement agreement). Because the legislature controls the Commission's jurisdiction and authority, the Commission's prior decisions to settle or litigate a case have no bearing on whether the Commission maintains jurisdiction and authority to approve rates.

As explained in the final order, if we were to agree with OPC, it "would mean that the parties to a settlement c[ould] somehow circumvent or expand the Commission's legal jurisdiction and authority beyond what is granted by Chapter 366, [Florida Statutes]."

OPC has failed to demonstrate a relevant agency practice in the first instance, much less that the Commission's actions in

approving the RSAM-ADP and the RSAM were inconsistent with such practice.  So, we also affirm on this issue.

### *Competent, Substantial Evidence*

OPC finally contends that the approvals of the RSAM-ADP and the RSAM are not supported by competent, substantial evidence. We disagree.

"[W]e review for competent, substantial evidence any factual findings upon which the Commission's decisions are based." *Fla. Rising, Inc.*, 415 So. 3d at 140.  So here, in evaluating the factual determinations underlying the Commission's approval of the RSAM-ADP and RSAM, we look to see if those factual determinations are supported by evidence that is "sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached." *DeGroot v. Sheffield*, 95 So. 2d 912, 916 (Fla. 1957).  We then review whether the Commission's policy decision falls within its delegated discretion.  *See Fla. Rising, Inc.*, 415 So. 3d at 140.

With respect to the Commission's approval of the RSAM-ADP, the Commission found they were the appropriate depreciation parameters in this case.  The Commission was persuaded by

testimony that the RSAM-ADP approach "was reasonable and would result in lower revenue requirements than the amount requested by FCG if the RSAM was not approved." That finding is supported by the testimonies of FCG witnesses Mark Campbell, Liz Fuentes, and Ned Allis.

Specifically, Mr. Campbell's testimony confirmed that the RSAM-ADP is: (1) based on the depreciation parameters for similar assets recently approved by the Commission in base rate case[17] settlement agreements; (2) within the reasonable range of alternative depreciation parameters typically proposed by other parties litigating depreciation studies before the Commission; and (3) generally in line with the depreciation parameters proposed by OPC's witness, David Garrett, in this and other cases.

Ms. Fuentes testified that the RSAM-ADP was based on the depreciation parameters that were previously approved by the Commission in a recent base rate settlement.

And Mr. Allis testified that the service lives and net salvage estimates used in the RSAM-ADP were not outside the "overall

---

17. *See generally 2020 PGS Order*, Order No. PSC-20-0485-FOF-GU, 2020 WL 7344673.

range of reasonableness" of similar depreciation studies. So, the Commission's ruling was well supported.

Our conclusion is supported by the fact that the Commission also heard and weighed conflicting evidence, including recommendations from its own staff. We expect, in a well-developed record, that there will be evidentiary assessments to make, for it is indeed the Commission's policymaking role to do so. *See O.H. v. Ag. for Pers. with Disab.*, 332 So. 3d 27, 33 (Fla. 3d DCA 2021) ("It does not matter that there may be competent substantial evidence to support alternative findings of fact, only whether the [Commission]'s findings of fact are supported by competent and substantial evidence." (citations omitted)). The Commission was wholly within its "prerogative to evaluate the testimony of competing experts and accord whatever weight to the conflicting opinions it deem[ed] appropriate." *Citizens I*, 146 So. 3d at 1166 (quoting *United Tel. Co. v. Mayo*, 345 So. 2d 648, 654 (Fla. 1977)). And it could accept or reject its own staff recommendations, too.

Our task, again, is to decide whether the Commission's decision is supported by competent, substantial evidence and rationally connected to a conclusion that is articulated in a

reasoned explanation. *See Fla. Rising, Inc.*, 415 So. 3d at 140. Here, we find that it is. Any finding beyond that narrow scope is an invitation to not only reweigh the evidence but violate basic tenets of separation of powers as well. *See FAIR*, 371 So. 3d at 911 (explaining that this Court's review is limited to looking at the reasons given by the Commission for its decision because to do otherwise "might upset the carefully constructed constitutional and statutory process applicable here").

With respect to the Commission's approval of the RSAM, we also disagree with OPC's contention that it was not supported by competent, substantial evidence. In its final order approving the RSAM, the Commission concluded that it "will result in a reduction of revenue requirement, save customers money on their utility bills, and give FCG the ability to manage its day-to-day business fluctuations, and allow FCG to take on the risk of increases in interest rates and inflation."

These findings are supported by the testimony of FCG witness Mr. Campbell, who testified that using the RSAM "will enable FCG to avoid increasing base rates through at least the end of 2026." This would, in turn, provide customers "with rate stability and

certainty, avoiding repetitive and costly rate proceedings, and enabling the Company to continue to focus on providing safe, reliable, and affordable service to our customers."

Furthermore, in his rebuttal testimony, Mr. Campbell testified that the RSAM, along with the RSAM-ADP, would save customers "nearly $10.8 million over the term of the four-year rate plan" and avoid "approximately $2.0 million in rate case expense in 2024." He testified that the RSAM allows FCG "to manage typical day-to-day fluctuations associated with running a utility business, while also having to absorb higher costs" associated with "record inflation and rising interest rates." Finally, Mr. Campbell testified that rejection of the RSAM would result in an overall net cumulative increase in cash to be paid by customers over the period 2023-2026 of approximately $27 million.

Again, OPC merely points to conflicting evidence and arguments. But we have addressed this point sufficiently. *See* s*upra* at 21-22. We affirm this issue.

### C. The Commission's Continuation of the Acquisition Adjustment Was Not Inconsistent with Official Policy and Is Supported by Competent, Substantial Evidence

Finally, OPC argues the Commission's decision to continue the

acquisition adjustment is: (1) inconsistent with the Commission's official policy preventing such continuation after a utility is subsequently purchased; and (2) not supported by competent, substantial evidence.  Both arguments fail.

With respect to its first claim, to establish an official policy concerning the continuation of acquisition adjustments, OPC relies on statements made by the Commission in two of its prior orders.[18]

The first statement is, "[a]cquisition adjustments do not survive subsequent purchases of the utility's assets," *In re Application for Ltd. Proceeding Increase & Restructuring of Water Rates by Sun Communities Finance Limited Partnership in Lake County, & Overearnings Investigation*, Order No. PSC-00-1165-PAA-WS at 16 (Fla. P.S.C. June 27, 2000), and the second is, "[c]onsistent with prior Commission decisions, acquisition adjustments do not survive subsequent transfers," *In re Joint Application for Approval of Sale of Florida Water Services Corp.'s*

---

18.  Again, this Court "shall remand a case to the agency for further proceedings consistent with the [C]ourt's decision or set aside agency action . . . when it finds that . . . [t]he agency's exercise of discretion was  . . . [i]nconsistent with officially stated agency policy."  § 120.68(7)(e)3., Fla. Stat.

*Land, Facilities, & Certificates in Brevard, Highlands, Lake, Orange, Pasco, Polk, Putnam, a Portion of Seminole, Volusia, and Washington Counties to Aqua Utilities Florida, Inc.*, Order No. PSC-05-1242-PAA-WS at 21 (Fla. P.S.C. Dec. 20, 2005).

Neither statement establishes the contended policy because they are distinguishable from the situation at hand. As a preliminary matter, the cited cases addressed water and wastewater utilities. This is not a throwaway distinction, because such utilities operate under an entirely different regulatory scheme than gas utilities. More specifically, water and wastewater utilities have a specific set of rules regulating when and how acquisition adjustments can be approved, *see* Fla. Admin. Code R. 25-30.0371 (outlining rules concerning acquisition adjustments for water and wastewater utilities), while gas utilities, like FCG, are not subject to *any* acquisition adjustment rules, *see* Fla. Admin. Code Ch. 25-7.

And while the two orders cited by OPC did not distinguish between the type of utility, it is not clear from these orders that the Commission intended for them to establish a universal policy for all utilities. On the contrary, in the gas utility context, the Commission has previously allowed gas utilities to continue

- 27 -

acquisition adjustments after subsequent acquisitions. For example, in 1990 the Commission approved a positive acquisition adjustment for Peoples Gas System, Inc (PGS). *See In re Application of Peoples Gas Sys., Inc. for a Rate Increase*, Order No. 23858, 1990 WL 10549082 (Fla. P.S.C. Dec. 11, 1990). And despite PGS being acquired in 1997, the Commission in 2003 granted the continuance of the 1990 acquisition adjustment. *In re Petition for Rate Increase by Peoples Gas Sys.*, Order No. PSC-03-0038-FOF-GU at 21, 2003 WL 105218 (Fla. P.S.C. Jan. 6, 2003).

Moreover, the acquisition adjustment at issue in this case further illustrates the lack of a universal policy concerning such adjustments. The acquisition adjustment at issue was first approved in 2007, continued after FCG's subsequent purchase by Southern in 2016, and remained on FCG's books after its 2018 rate case settlement. *See 2007 AGLR Order*, Order No. PSC-07-0913-PAA-GU at 9, 2007 WL 4164224 (granting acquisition adjustment); *2018 FCG Order*, Order No. PSC-18-0190-FOF-GU at 3, 2018 WL 1942172, at \*2 (approving settlement agreement without removing the acquisition adjustment).

Although OPC is correct that these orders did not directly address whether acquisition adjustments survive a subsequent acquisition, these orders shed further light on the fact that in the gas utilities context, the Commission does not have a policy but instead has a history of continuing acquisition adjustments. Consequently, OPC has failed to establish that the Commission's approval of the continuation of the acquisition adjustment was inconsistent with official policy.

We also disagree with OPC's second claim that the Commission's decision to continue the acquisition adjustment is not supported by competent, substantial evidence.

In its final order, the Commission found "that the amortization of the acquisition adjustment shall continue until the next general rate case." Undergirding this finding was testimony from FCG witness Ms. Fuentes, who testified on this issue and provided support for the net acquisition adjustment of $11.8 million and amortization expense of $0.7 million. She further testified that the precedent cited by OPC witness Helmuth Schultz does not establish a Commission policy applicable to gas utilities, and that even FCG's acquisition adjustment had already survived the 2016 purchase by

Southern. Ultimately, Fuentes concluded that "there is no need to make adjustments to remove the AGLR acquisition adjustment and associated amortization from FCG's 2023 Test Year."

OPC does not dispute Ms. Fuentes' testimony but, as it has on other issues in this appeal, contends that the Commission should have relied on the conflicting evidence OPC provided, including the Commission's rejected staff recommendation. But the Commission reasonably explained that because it approved a 30-year amortization period for the acquisition adjustment in 2007, it would continue the period until FCG's next general rate case—at which time FCG would need to justify further continuance, as the 30-year period will have ended. We therefore reject this claim.

## IV. CONCLUSION

In sum, because none of OPC's claims warrant relief, we affirm the Commission's final and clarifying final orders.

It is so ordered.

LABARGA, COURIEL, and SASSO, JJ., concur.
MUÑIZ, C.J., dissents with an opinion, in which GROSSHANS, J., concurs.
TANENBAUM, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

MUÑIZ, C.J., dissenting.

For reasons involving the approved reserve surplus amortization mechanism (RSAM) and RSAM-adjusted depreciation parameters (RSAM-ADP), I would vacate the Commission's final order and clarifying order and remand for further proceedings.[19]

First, the Commission's reasoning in approving FCG's revised depreciation rates (the RSAM-ADP) is arbitrary in that it is inconsistent with the relevant statute and depreciation rule. The Commission's reasons for approving those rates were untethered to the purpose of depreciation; instead, those rates (out of three options) were chosen because they will produce a large enough theoretical depreciation reserve surplus for the utility to then "use" as a two-way accounting mechanism (the RSAM) to "manage" earnings by potentially offsetting items that have nothing to do with depreciation. I respectfully disagree with the majority's suggestion that the Commission first independently selected "reasonable" depreciation parameters and only then set about deciding what to

_____

19. I do not take issue with the majority's treatment of the acquisition-adjustment issue.

- 31 -

do with the $52.1 million surplus resulting from that selection (here, choosing the RSAM). The record plainly reflects that the tail (the RSAM) wagged the dog (selecting depreciation rates).

Second, putting aside the Commission's approval of the RSAM-ADP, the Commission nevertheless failed to then require appropriate measures to "correct" the resulting $52.1 million surplus. The Commission thus departed—without adequate explanation—from what the Commission has described as its "policy . . . to correct [reserve imbalances] as soon as possible without adversely impacting the company's ability to earn a fair and reasonable return." *In re Petition for Increase in Rates by Fla. Power & Light Co.; In re 2009 Depreciation & Dismantlement Study by Fla. Power & Light Co.*, Order No. PSC-10-0153-FOF-EI at 87, 2010 WL 1005321 (Fla. P.S.C. Mar. 17, 2010). Here, the Commission inexplicably left wholly unaddressed $27.1 million of the surplus. That alone warrants remand. As to the remaining $25 million, the Commission authorized that amount for "use" under the RSAM. But the RSAM, by its express terms, does not "correct" that surplus amount. Rather, the RSAM—which allows the company to debit *or* credit depreciation expense (and depreciation reserve) "at [the

company's] sole discretion," subject to certain conditions—only *potentially* eliminates that amount. I respectfully disagree with the majority's suggestion that the RSAM "correct[s] the imbalance," majority op. at 13, and its further suggestion that the Commission has discretion in deciding "whether" to correct a reserve imbalance, *see id.* at 16.

I

Depreciation matters in the context of utility ratemaking. Not only does accumulated depreciation factor into the "rate base," but annual depreciation expense is also passed along to ratepayers as part of the utility's revenue requirement.[20] So it is unsurprising that depreciation is expressly mentioned in section 366.06, Florida Statutes, and is the subject of an entire administrative rule. It is similarly not surprising that the statute and rule both focus on ensuring that ratepayers do not overpay.

---

20. This Court has very generally described a public utility's "gross revenue" requirement as the sum of two items: (1) "the utility's rate base" (i.e., "the utility property which provides the services for which rates are charged") multiplied by a reasonable rate of return; plus (2) "[o]perating expenses and income taxes." *State v. Hawkins*, 364 So. 2d 723, 724 (Fla. 1978).

- 33 -

Section 366.06(1) vests the Commission with "the authority to determine and fix fair, just, and reasonable rates." The statute includes the following mandate:

> The commission shall investigate and determine the *actual legitimate costs of the property* of each utility company, *actually used and useful in the public service*, and shall keep a current record of the net investment of each public utility company in such property which value, as determined by the commission, shall be used for ratemaking purposes and shall be the *money honestly and prudently invested by the public utility company in such property used and useful in serving the public, less accrued depreciation* . . . .

§ 366.06(1), Fla. Stat. (emphasis added). The text of the statute conveys that ratepayers should pay for the benefit of what they "actually" receive. Nothing in the statute—which uses terms like "actual legitimate costs," "honestly and prudently invested," and "used and useful in serving the public"—suggests that "depreciation" of a utility's used and useful property should be uncoupled from that basic principle. The Commission itself has never suggested as much. Instead, the Commission has said that "[t]he purpose of depreciation is to match expenses to the period the assets associated with those expenses are providing service to the public." *In re Petition for Increase in Rates by Fla. Power & Light*

- 34 -

*Co.*, Order No. PSC-10-0153-FOF-EI at 23, 2010 WL 1005321. It necessarily follows that the approval of a utility's depreciation rates should be grounded in that "purpose," not in reasoning divorced from it.

The Depreciation Rule (Rule 25-7.045, Florida Administrative Code) complements the statute by requiring the utility to provide certain information necessary for the Commission to examine the merits of the utility's depreciation calculations—again, the goal being to match cost recovery expenses to the time periods in which ratepayers receive the benefit of the utility's used and useful property. Signaling the importance of establishing and maintaining appropriate depreciation rates, the rule precludes any utility from "chang[ing] any existing depreciation rate or initiat[ing] any new depreciation rate without prior Commission approval." Fla. Admin. Code R. 25-7.045(2)(a). The rule goes on to mandate that each utility file with the Commission a depreciation study—with detailed information requirements—"at least once every five years . . . regardless if a change in rates is being requested." *Id.* R. 25-7.045(4)-(5). The rule also requires a utility to file "an annual depreciation status report." *Id.* R. 25-7.045(6). This all plainly

underscores the rule's overarching concern with best matching depreciation cost recovery expenses to the time periods in which ratepayers receive the benefit of the utility's used and useful property.

The Depreciation Rule recognizes that depreciation is an inexact science and that best estimates may change over time, potentially resulting in the need to revise depreciation rates. The rule thus contemplates that imbalances in the depreciation reserve may occur upon such a change in depreciation rates. Indeed, the rule defines terms like "Reserve Deficiency" and "Reserve Surplus." *Id.* R. 25-7.045(1)(h), (i). The latter (a surplus) is where "current projections of life and salvage" reflect that the utility has over-collected depreciation expense (because, say, the current projections indicate that the depreciable property has a longer useful life than originally projected, meaning that the cost recovery should have been spread over a longer period than originally determined). The former (a deficiency) is, of course, the opposite. Both definitions, however, provide that the imbalance must be one that is "*necessary* under current projections of life and salvage." *Id.* (emphasis added).

- 36 -

With respect to a reserve imbalance, the Depreciation Rule says that "[t]he possibility of corrective reserve transfers shall be investigated by the Commission prior to changing depreciation rates." *Id.* R. 25-7.045(4)(e). So "corrective reserve transfers"— which appear to be an immediately "corrective" measure, as opposed to other, non-immediately "corrective" measures (e.g., the remaining life technique)[21]—are not necessarily required when a change in depreciation rates results in an imbalance. But the rule

---

21. A non-immediately corrective measure would be one that "corrects" a reserve imbalance over time, either in an accelerated manner or over the remaining life of the relevant investment. The Commission has said that "[t]he remaining life rate typically carries the burden of correcting any reserve imbalance." *In re Petition for Increase in Rates by Fla. Power & Light Co.*, Order No. PSC-10-0153-FOF-EI at 84, 2010 WL 1005321. As an example of the remaining life rate, assume that a depreciable investment of $100 has an expected life of 10 years with no salvage value. The annual depreciation expense would be $10. Assume, however, that after 6 years (i.e., $60 has been recovered, $40 remains to be recovered), the expected life is now 20 years, such that the annual depreciation expense should have only been $5 instead of $10 (i.e., there has been an over-collection, or "surplus," of $30 after 6 years). Under the remaining life rate, rather than a $5 depreciation expense for each of the remaining 14 years (which would cumulatively amount to recovering $130 for a $100 investment—i.e., [6 * $10] + [14 * $5]), the annual depreciation expense for each of the remaining 14 years would instead only be $40/14 years, or $2.86 per year, thereby allowing the "surplus" of $30 to self-correct over the remaining 14 years (i.e., [6 * $10] + [14 * $2.86] = $100).

mandates that the Commission at least investigate the possibility of that form of corrective measure, while affording the utility and the Commission the flexibility to adopt other corrective measures.

II

As explained below, the Commission's reasoning in approving the RSAM-ADP as the appropriate depreciation rates for the company's "used and useful" property had nothing to do with those rates' relative merits in accurately calculating depreciation. And because the Commission's reasoning was untethered to the purpose of depreciation, its orders are inconsistent with the statute and the rule outlined above.

The majority frames the relevant issue as simply whether "the Depreciation Rule prohibits the Commission from approving depreciation parameters that result in a reserve imbalance surplus." Majority op. at 9. I agree with the majority that the rule does not prohibit the Commission from doing so. Indeed, the rule expressly contemplates that reserve imbalances might result from a *necessary* change in depreciation rates.

But this case is actually about whether the governing statute and rule allow the Commission to approve new depreciation rates—

rates that, in the words of the company's own expert, are not the "most reasonable"—for the very purpose of *creating* a depreciation reserve surplus, so that the utility can then "use" its depreciation account to "manage" its earnings. In my view, the answer to that question is no.

The Commission was presented with three depreciation proposals: (1) FCG's 2022 Depreciation Study—i.e., the company-specific study mandated by the Depreciation Rule—which resulted in a reserve *deficiency* of $3.2 million; (2) OPC's parameters, which proposed relatively minor adjustments to FCG's 2022 study; and (3) the RSAM-ADP—i.e., FCG's alternative depreciation study, based on parameters approved in a different utility's case and then applied to FCG's assets—which resulted in a reserve *surplus* of $52.1 million. FCG's expert depreciation witness testified that the company's 2022 Depreciation Study was the "most reasonable," but that the RSAM-adjusted depreciation parameters were "within th[e] overall range [of reasonableness]" and were not "well outside of the overall range of reasonableness" or "way outside of the bounds."

In its petition for rate increase, the company proposed a four-year rate plan, one the company would only commit to if, among

other things, the RSAM was approved. Indeed, the company asserted that the RSAM was "a critical and essential component" of the four-year plan and that "approval of [the] RSAM-adjusted depreciation rates" (with accompanying surplus of $52.1 million) was "necessary to support the RSAM." So, FCG's position in its four-year proposal was that the company had over-collected $52.1 million of depreciation expense and that the Commission should approve depreciation rates reflecting that over-collection. The company went on to request that $25 million of the $52.1 million surplus "be available for use" during the four-year period. That "use," of course, was via the RSAM, which the petition describes as a two-way "accounting mechanism" to "record increases to expense (debits) *or* decreases to expense (credits) such that the overall resulting ROE for that rolling period equals a pre-established ROE within the authorized range." (Emphasis added.) The company also asserted that the RSAM-adjusted depreciation rates themselves would benefit ratepayers in the sense that those depreciation rates would "decrease[] the incremental revenue requirement by $2.7 million," or, in the words of another FCG witness, "nearly $10.8

million over the term of the four-year rate plan."[22]

But the company did not pretend that, of the three depreciation options presented, the RSAM-adjusted depreciation rates were the most reasonable. Rather, the petition made clear that, absent approval of the RSAM, the company sought only one year of rate relief, one in which the company's forecasted data were based *not* on the RSAM-adjusted depreciation rates, but on "the depreciation rates resulting from the 2022 Depreciation Study"—i.e., the company-specific study mandated by the Depreciation Rule. In other words, without the RSAM, the company apparently did not believe that it had over-collected $52.1 million of depreciation expense or that its customers should get the benefit of the purported $2.7 million decreased incremental revenue requirement associated with the RSAM-adjusted depreciation rates. In short, the petition unmistakably makes clear that the RSAM came first, then the RSAM-adjusted depreciation rates (as a necessary means to an end).

---

22. This appears to mean that the depreciation rates under the RSAM-ADP would result in $2.7 million less of depreciation expense per year than would the rates under the FCG 2022 study.

The Commission's final order similarly reflects that the tail wagged the dog, despite the Commission's attempts to suggest otherwise. In the final order's Background section, the Commission recognizes FCG's position that "approval of the RSAM-adjusted depreciation rates" was "necessary to support the RSAM." And in its analysis of the depreciation issue, the Commission promptly notes the testimony that, of the three options presented, only the RSAM-ADP would "result in a large enough reserve for the RSAM to function properly." In its entirety, the reasoning underlying the Commission's approval consisted of one conclusory sentence declaring that the RSAM-adjusted depreciation parameters were "the appropriate depreciation parameters."

After discussing its selection of the RSAM-ADP, the Commission next perfunctorily addressed "corrective measures," purporting to do so "[b]ecause the approval of the RSAM parameters will result in a [$52.1 million] reserve imbalance." Noting the competing testimony regarding whether the RSAM would benefit customers, the Commission ultimately "approve[d] FCG's proposed use of the RSAM along with its Reserve Surplus of $25 million." And as to "the remaining reserve surplus of $27.1 million," the

Commission decided that it should simply "remain on FCG's books and records" because "FCG did not propose any treatment for [it]."

The record lays bare that FCG reverse-engineered a depreciation reserve surplus as a vehicle to justify the adoption of an earnings management tool (the RSAM) that is unrelated to depreciation. The Commission's reasoning in approving the RSAM-adjusted depreciation rates—that, of the three depreciation options presented, only the RSAM-ADP would "result in a large enough reserve for the RSAM to function properly"—runs counter to the governing statute, the Depreciation Rule, and the principle of best attempting to match cost recovery expenses to the period in which ratepayers receive the benefit of the utility's used and useful property. *Cf. In re Tampa Elec. Co.*, Order No. PSC-02-1492-PAA-GU at 4-5, 2002 WL 31465320 (Fla. P.S.C. Oct. 31, 2002) ("[D]epreciation rates shall not be held constant for the sake of maintaining a desired level of expenses. Depreciation rates shall be the result of the appropriate life and salvage estimates along with the current reserve position as of the given point in time the analysis is performed."). Accordingly, I would vacate the orders under review and remand for further proceedings. *See*

- 43 -

§ 120.68(7)(e)2., Fla. Stat. (authorizing remand when the court "finds that . . . [t]he agency's exercise of discretion was . . . [i]nconsistent with agency rule").

III

Compounding its error in approving the RSAM-adjusted depreciation rates, the Commission also failed to take appropriate measures to "correct" the resulting $52.1 million surplus. Without adequate explanation, the Commission thus deviated from its stated "policy." *See* § 120.68(7)(e)3., Fla. Stat. That "policy," in the Commission's words, is to "correct [imbalances] as soon as possible without adversely impacting the company's ability to earn a fair and reasonable return." *In re Petition for Increase in Rates by Fla. Power & Light Co.*, Order No. PSC-10-0153-FOF-EI at 87, 2010 WL 1005321; *see id.* at 86 ("Whether the reserve imbalance is a surplus or a deficit, it violates the matching principle and represents a subsidy, and thus should be corrected.").

A

Start with "the remaining reserve surplus of $27.1 million"— i.e., that portion of the $52.1 million surplus *not* "available for use" under the RSAM. As to that amount, the Commission did not even

- 44 -

pretend to consider any "corrective measure." Indeed, after acknowledging that "FCG did not propose any treatment for the remaining reserve surplus of $27.1 million," the Commission decided that the $27.1 million would simply "remain on FCG's books and records." Said differently, the Commission approved a surplus of $52.1 million and then left wholly unaddressed more than half of that amount. Because the Commission did "not explain[]" its "deviation []from" its stated policy, § 120.68(7)(e)3., Fla. Stat., or even "articulate[] a reasoned explanation for its decision," *Fla. Rising, Inc. v. Fla. Pub. Serv. Comm'n*, 415 So. 3d 135, 140 (Fla. 2025), the unaccounted-for $27.1 million alone warrants vacatur and remand.

B

As to the $25 million portion of the surplus that the Commission approved for "use" under the RSAM, it appears the Commission similarly deviated from its stated policy. Contrary to the majority's suggestions, the RSAM does not "correct" the $25 million portion of the surplus, let alone the entire surplus. I thus respectfully disagree with the majority's view that "the Commission approved the RSAM to correct the imbalance." Majority op. at 12-

- 45 -

13.

At most, the two-way RSAM mechanism only *potentially* eliminates the $25 million portion of the surplus.  By its own terms, the RSAM does not guarantee that the $25 million will be fully amortized—or amortized at all—by the end of the four-year term. As OPC correctly explains, the RSAM "allows the Company to reduce or increase depreciation expense and artificially create and un-create a reserve surplus an unlimited number of times to enhance FCG's earnings."  Indeed, the RSAM exhibit produced by the company provides that, under the RSAM, "FCG may record credits to depreciation expense and debits to depreciation reserve, *or* debits to depreciation expense and credits to depreciation reserve in any period at its sole discretion subject to [certain] conditions." (Emphasis added.)  In short, regardless of whether it is likely, it is entirely possible that, at the end of the four-year term, the $25 million portion of the surplus (or some part of it) remains unamortized under the RSAM.  That is not a mechanism that "corrects" a surplus.  Rather, borrowing the Commission's own words, it is a mechanism that requires a "large enough" surplus in order "to function properly."  I would remand for the Commission to

- 46 -

"explain[]" its "deviation []from" its stated policy, § 120.68(7)(e)3.,

Fla. Stat., or—at a minimum—to "articulate[] a reasoned

explanation for its decision," *Fla. Rising*, 415 So. 3d at 140.[23]

Importantly, while I agree with the majority that a utility has

discretion over how to correct a reserve imbalance, the governing

statute and rule do not leave discretion over whether to correct an

imbalance at all. It is true that, under the Depreciation Rule,

"corrective reserve transfers" are not mandatory. But that is

because such transfers are only one of many measures available to

correct an imbalance.[24] At some point, an imbalance must be

---

23. There are other problematic aspects to the Commission's conclusory assertions regarding the RSAM-ADP and RSAM. For example, while I understand that the Commission is not compelled to accept the analysis and recommendations of its professional staff, it is nevertheless concerning—and perhaps telling—that the Commission chose to entirely ignore its own staff's logical and intuitive analysis and recommendation that "[t]he proposed RSAM contradicts well-established Commission practice and ratemaking principles, could potentially result in double recovery by the Company from its customers in the future, and could allow a depreciation surplus paid by customers to be transferred unfairly to shareholders."

24. The majority itself recognizes the distinction between the terms "corrective reserve transfers" and "correction," noting that the Commission has taken "a variety of . . . approaches" to "correcting imbalances" beyond just approving "corrective transfers." *See* majority op. at 14. One such approach is the "remaining life

corrected, whether by corrective transfer, the remaining life technique, or some other approach. Otherwise, an uncorrected surplus, for example, would result in a utility ultimately recovering more in depreciation expense than the cost of the property. And that result is plainly impermissible.

IV

For the reasons explained above, I would vacate the Commission's order and clarifying order and remand for further proceedings.

GROSSHANS, J., concurs.

An Appeal from the Florida Public Service Commission

Charles J. Rehwinkel, Deputy Public Counsel, Mary A. Wessling, Associate Public Counsel, Octavio Simoes-Ponce, Associate Public Counsel, and Austin Watrous, Associate Public Counsel, Office of Public Counsel, Tallahassee, Florida,

    for Appellants Citizens of the State of Florida

Ricky L. Polston, Daniel E. Nordby, and Denise M. Harle of Shutts & Bowen LLP, Tallahassee, Florida, Michael P. Silver and Alyssa L. Cory of Shutts & Bowen LLP, Tampa, Florida; Beth Keating of Gunster, Yoakley & Stewart, Tallahassee, Florida, and Lauren V. Purdy of Gunster, Yoakley & Stewart, P.A., Jacksonville, Florida,

---

technique," which, as the majority notes, self-corrects an imbalance over the remaining life of the investment. *Id.* at 15 n.13.

for Appellee Florida City Gas

Keith C. Hetrick, General Counsel, Samantha M. Cibula, Attorney Supervisor, Jonathan H. Rubottom, Senior Attorney, and Caroline G. Dike, Senior Attorney, Florida Public Service Commission, Tallahassee, Florida,

for Appellee Florida Public Service Commission